UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RODNEY ALAN TITUS and<br>JAMES WAYNE TIPTON,<br><br>Defendants. | 4:16-CR-40067-KES<br><br><br>REPORT AND RECOMMENDATION<br><br>[DEFENDANTS' MOTIONS TO<br>SUPPRESS, DOCKET NOS. 74 & 76] |

Defendants Rodney Alan Titus and James Wayne Tipton are before the court on an indictment charging them with being felons in possession of a firearm.  See Doc. 1.  Both defendants have filed motions to suppress certain evidence.  See Docket Nos. 74 & 76.  The United States ("government") resists the motion.  See Docket No. 81.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

## FACTS

An evidentiary hearing was held on Wednesday, April 19, 2017. Mr. Titus was there in person along with his lawyer, Assistant Federal Public Defender Jason Tupman. Mr. Tipton was there in person along with his lawyer,

Joshua Zellmer.   The government was represented by its Assistant United States Attorney, Connie Larson.  Four witnesses testified and eight exhibits were received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

On April 14, 2016, several members of the Mitchell Police Department became involved in an investigation of indecent exposure on the campus of Dakota Wesleyan University ("DWU") in Mitchell, South Dakota.  A young woman in the DWU library had been approached by a man who exposed his genitals to her ("the flasher.")  The young woman described the man as being a white male, approximately 25-30 years old, having short brown hair, wearing a dark t-shirt, and dark colored flannel pants.  The call regarding the indecent exposure in the DWU library came in to the Mitchell Police Department at approximately 10:49 a.m.  See EX A.[1]

Earlier in the day, another person had been spotted on campus by DWU employees, whom the employees deemed suspicious (the "suspicious person").  The suspicious person had not done anything illegal.  The suspicious person was a white male and was six feet tall, with short or "buzzed" hair.[2]   He was

---

[1] EX A is a copy of a portion of the Mitchell Police Department dispatch report for April 14, 2016.  The first page contains a key indicating which officers were assigned which call numbers for that date, to assist the reader in determining which officers were at which locations at which times.   The dispatch report is recorded in military time.  For the convenience of the reader, the times have been converted to regular time in this opinion.

[2] It was not completely clear who reported the height of the suspicious person but Det. Arnold explained that this detail emerged and was reported to him when he arrived on campus at DWU.  Detective Larson recalled that the suspicious person was also described as having short, "buzzed" hair.

deemed suspicious by campus personnel because he was a person unfamiliar to campus[3] and he was wearing a black bandana over his face.  The victim of the indecent exposure incident did not see a black bandana, and it was never determined whether the man wearing the black bandana over his face on campus earlier in the morning (the suspicious person) was the same person who exposed himself in the library (the flasher).  Nevertheless, the Mitchell police included in their description of the flasher the possibility that the man who exposed himself in the library may be wearing or in possession of a black bandana.

It is fair to say that as the investigation progressed, the description of the suspicious person spotted earlier in the morning on the DWU campus and the description of the library flasher became combined into one blended description.  Officer Kelly Loudenburg explained he met with the DWU president.  She told Officer Loudenburg about the suspicious person who had been seen on campus earlier in the morning, before the flasher incident.  Officer Loudenburg got the description of the suspicious person from the DWU president; then he met with the flasher victim and got the description of the flasher.  Officer Loudenburg unequivocally testified that he gave <u>both</u> descriptions to the other Mitchell Police Department officers and <u>both</u>

---

[3] DWU is a small, private, religiously affiliated college.  Its total student population is approximately 1,000 students, with only 378 men.  <u>See</u> https://www.dwu.edu/assets/uploads/general/2016-17_DWU_Fact_Sheet.pdf It is not surprising, then, that both the flasher and the suspicious person were recognized and described by witnesses as someone who "did not belong" or "was not from" campus.  See EX A, p. 2; Transcript, p. 150.

3

descriptions were broadcast out over the police radio, because nobody was sure if the two incidents were related.  See transcript at pp. 150-51.

Detective Peter Arnold, along with Detectives Daniel Fechner and Brian Larson arrived on the DWU campus.  Other Mitchell Police Department officers were also on scene, including Patrol Officer Loudenburg.  The officers obtained the description of the suspect.[4]  They searched the campus for anyone matching the description.  After a little over an hour on campus, Detectives Arnold, Fechner and Larson had not found anyone who matched the description of the flasher.  They received a report of someone matching the description of the flasher, and who was wearing a black bandana, walking down Havens Avenue (which is near the DWU campus), westbound.[5]  They decided to expand their search by looking for the suspect in and around the businesses located on West Havens Avenue.  The officers were unsuccessful finding anyone at Stepping Stones, a drug treatment center.  Next, they decided to canvass the motels on West Havens Avenue.

The officers stopped at the office of the Siesta Motel and spoke with the owner/manager.  The officers described the DWU flasher, but the manager said

---

[4] As described above, included in the description of the suspect for whom the Mitchell police were to be on the lookout for were the characteristics of the suspicious person who had been spotted on campus earlier in the morning, even though the flasher victim never saw a black bandana and even though it was never determined whether the suspicious person and the flasher were one-in-the-same.

[5] This detail was mentioned in Detective Arnold's report, a portion of which was produced to the court before the evidentiary hearing.  See Docket 75-5, p. 1.  During the evidentiary hearing, Detective Arnold mentioned an individual matching the suspect's description was seen walking down West Havens Street, but he did not specifically mention the black bandana.

he had not seen anyone matching that description.  The Siesta manager told the officers, however, that two men who were acting suspicious had checked into room 15 of the motel just a few minutes earlier.  The manager indicated the person who rented the room was James Tipton, but he did not believe either of the two men was in the room at the moment.  The officers verified the manager's belief by driving past room 15.  They observed one vehicle parked in front of the room, but they did not stop or approach the room.  The officers left the Siesta for a few moments to continue their canvass of the area for the DWU flasher suspect.

Even though the Siesta manager said he had not seen anyone matching the DWU flasher's description, Detective Arnold's interest was piqued by the manager's comments about the two men in room 15.  First, the manager said the men were acting suspicious, and second, Detective Arnold was then investigating a fraud case in which the victim's name was James Tipton and the perpetrator (Josh Tipton—James's son) had assumed his father's identity, cashed checks stolen from his father, and had been spending the cash proceeds.  The James Tipton who had checked into the Siesta paid in cash. Detective Arnold believed, therefore, that the James Tipton in room 15 might in reality be Joshua Tipton posing as his father, James Tipton.  For these reasons in addition to the flasher investigation, Detective Arnold wanted to return to the Siesta to check out the two men in room 15.

The officers left the Siesta and drove around the area for a few moments. They circled back around the block and noticed a second vehicle had parked in

front of room 15 at the Siesta, so they stopped to investigate.  The police dispatch log indicates the detectives returned to the Siesta at 12:38 p.m.  See EX A.  The officers ran the license plates on both vehicles parked in front of room 15.  Both vehicles were registered to Rodney Titus.  Both vehicles were full of what appeared to be household items.  See EX B (photos of vehicles).  Mr. Tipton would later explain that although both vehicles were registered to Mr. Titus, he (Tipton) was in the process of purchasing the Mercury Mountaineer from Mr. Titus.  The men would also later explain the vehicles were full of household items because they were in the process of moving Mr. Tipton from a different motel in Mitchell to the Siesta.  Mr. Titus was in the process of moving from a home in Huron, South Dakota, to an unknown location in Mitchell.

Det. Arnold and Det. Larson approached the door, which is pictured on EX 5.  There is a large window to the right of the door to room 15.  Id.  The door was closed but the blinds/shades that covered the large window to room 15 were slightly open.  Id.  Det. Arnold knocked on the door while Det. Larson peeked through the slightly opened window shades.  Det. Larson could see two people in the room and a black bandana on one of the beds.  When Det. Arnold knocked on the door, the person toward the back of the room (who was wearing a green shirt) picked up something black and headed for the bathroom out of sight.  The person toward the front of the room hesitated before answering.  Det. Larson estimated there was about a minute delay before the person at the front of the room opened the door.  Though he would later write in his report

6

that the person toward the back of the room "carried something into the bathroom," the comment Det. Larson made to Det. Arnold contemporaneously was, "they're hiding something."[6] Det. Arnold explained Det. Larson had to hold his badge up to the window before the person at the front of the room finally opened the door.

The person at the front of the room (later determined to be Mr. Tipton) opened the door.  Det. Arnold, suspecting the person might be his fraud suspect, asked if Joshua Tipton was in the room.  Mr. Tipton insisted he was James Tipton, not Joshua Tipton, and produced an identification card to prove his identity as James Tipton.  Det. Arnold and Det. Larson asked if anyone else was in the room, and Mr. Tipton denied the presence of anyone else.[7] Det. Larson confronted Mr. Tipton about this deception, because Det. Larson had seen another person in the room as he peered in through the open blinds.

Only after having been confronted about his deception did Mr. Tipton admit there was another person in room 15.  Mr. Tipton said his cousin, Rodney Titus, was in the bathroom, and called for Mr. Titus to come out.  At this point, Det. Arnold asked Mr. Tipton if he could enter the room, to which Mr. Tipton agreed.  Det. Arnold entered the motel room, either to call Mr. Titus

---

[6] During the evidentiary hearing, Det. Larson first testified he told Det. Arnold "he's hiding something," but on cross-examination testified he told Det. Arnold "they're hiding something."  The detectives testified that they wrote their reports a day after the encounter at the Siesta Motel (in other words, a day after the search warrant affidavit was written and the warrant was executed).

[7] At the evidentiary hearing, Det. Arnold did not recall this denial, but Det. Larson did.

out of the bathroom or to conduct a safety sweep or both.  When the motel door was opened, two black bandanas could be seen in plain sight lying on one of the beds.  The officers brought both Mr. Tipton and Mr. Titus outside the motel room, onto the sidewalk in front of the room. Mr. Tipton was wearing jeans and a black t-shirt with a large, white print of a woman's face on the front. Mr. Titus was wearing long, baggy shorts and a green t-shirt.  See EX B (photos).[8]

The officers told Mr. Tipton and Mr. Titus the purpose(s) for their visit at the Siesta.  When the officers told the men about the flasher incident at the DWU library and described the suspect, Mr. Titus laughingly agreed that Mr. Tipton matched the description of the flasher.  Throughout his interaction with Mr. Tipton, Det. Arnold and Det. Fechner observed that Mr. Tipton was very animated and seemed overly nervous.

Detective Fechner is certified as a drug recognition expert, but he did not conduct any drug recognition examinations or field sobriety tests on either Mr. Tipton or Mr. Titus while at the Siesta motel on April 14, 2016. Det. Fechner described Mr. Tipton's emotions as ranging from argumentative to calm to irate and then back to calm again within a very short amount of time. Both Det. Arnold and Det. Fechner explained that in their professional experience, they believed Mr. Tipton was displaying signs of being under the influence of narcotics.

---

[8] The defendants offered EX B into evidence, which is a CD containing a several photos and some video evidence.   During the hearing, the defendants withdrew their offer of only that portion of EX B which contains the surveillance videos.

After visiting with Mr. Tipton and having reviewed the identification he produced at the door of the motel, Det. Arnold ruled out Mr. Tipton as the suspect he sought in his fraud case within the first fifteen minutes of their visit at the Siesta motel.

Det. Arnold noticed Mr. Titus was wearing an ankle monitor.  From this, the officers deduced Mr. Titus was on some sort of supervised probation or parole, so Det. Arnold asked both men about their criminal histories.  Both reported past felony convictions and narcotics arrests.  Based upon the totality of the observations the officers made since their arrival at the motel (Mr. Titus trying to hide something in the bathroom, Mr. Tipton denying Mr. Titus's presence in the room, Mr. Tipton's behavior, both men having admitted past felony convictions and drug arrests), Det. Arnold summoned the assistance of a South Dakota Highway Patrol officer and his drug-sniffing dog.  The police dispatch log which was received into evidence at the evidentiary hearing (EX A) shows that the officers returned to the Siesta at 12:38 p.m. and the SDHP was summoned at 1:24 p.m.  See EX A.  The drug-sniffing dog arrived at 1:27 p.m. and alerted to the presence of drugs on the Mercury Mountaineer.  By 1:50 p.m., Det. Arnold called dispatch to request a unit to "sit on the room while I obtain a search warrant."  Id.

At approximately 12:50 p.m. the dispatch log shows that Det. Fechner called for a transport unit to be sent to the Siesta.  Id.  Det. Fechner explained at the evidentiary hearing, however, that this was probably the time he called for another unit to be sent to the motel because he needed to leave to retrieve

9

and then deliver supplies.   Specifically, Det. Fechner had been instructed to retrieve a thumb drive from the police department and deliver it to Officer Loudenburg who remained at the DWU campus, and to pick up consent-to-search supplies for the officers who remained at the Siesta Motel.  Det. Fechner left the Siesta at 1:07 and picked up the thumb drive at the police department at 1:10 (See EX A), then traveled to the DWU campus where Officer Loudenburg had been working with the IT Department to retrieve video footage from the DWU library.

Officer Loudenburg, along with DWU staff, had retrieved video footage from earlier in the day at the DWU library of a person they believed might be the DWU flasher.  They contacted the victim to have her review the footage.  The victim confirmed that the person in the footage was in fact the DWU flasher.

Officer Loudenburg was in a different part of the campus interviewing witnesses when Officer Fechner arrived to deliver the thumb drive.  Officer Fechner confirmed with the campus IT person, however, that the victim had positively identified the person on the video footage as the DWU flasher.  Officer Fechner took a photo of the flasher with his cell phone from the video as it appeared on the IT person's computer screen at DWU.  Det. Fechner left the thumb drive for Officer Loudenburg, and returned to the Siesta Motel to show the cell phone photo to Det. Arnold.  See EX 6.[9]

---

[9] Det. Arnold could not unequivocally state that any one of the photos from EX 6 was the one he viewed on April 14, 2016.  He believed the photos contained

Based on his review of the video and the still photo taken from the video, Det. Fechner did not believe Mr. Tipton was the DWU flasher.  Once the victim confirmed the person on the video footage was the DWU flasher and Officer Loudenburg had received the thumb drive, Officer Loudenburg copied the video footage onto the thumb drive and delivered the thumb drive to the Mitchell Police Department.  Officer Loudenburg estimates he placed the thumb drive with the video footage in the evidence locker at the Mitchell Police Department at approximately 1:54 p.m. on April 14, 2016.  <u>See</u> EX A.

By the time Det. Fechner returned to the Siesta Motel (about 1:46 p.m.— <u>See</u> EX A) to show Det. Arnold the cell phone photos of the flasher captured from the DWU library surveillance video, the SDHP trooper had arrived with his drug dog and the dog had positively alerted on the Mercury Mountaineer.  In Detective Fechner's mind, the focus of investigation at the Siesta Motel had shifted from the DWU flasher and/or Det. Arnold's fraud investigation to a drug investigation.  Det. Fechner testified that he showed the cell phone photos of the DWU flasher to Det. Arnold, but upon his return to the Siesta Det. Fechner did not have an in-depth discussion with Det. Arnold about whether Mr. Tipton might be the DWU flasher because by then, the focus of the investigation at the Siesta had shifted to a narcotics investigation.

By 1:50 p.m., Det. Arnold had decided to apply for a warrant to search room 15 at the Siesta Motel.  <u>See</u> EX A.  At 1:51 p.m., Detectives Arnold and Fechner transported Mr. Titus back to the Mitchell Police station, and another

in EX 6, however, to be representative of the image and quality of the photo he did view from Det. Fechner's phone on April 14, 2016.

officer transported Mr. Tipton.  Id.  Det. Arnold arrived at the police station at 1:55 p.m.  Id.  At 2:10 p.m., Det. Arnold requested a "Triple I" (criminal history) for both Mr. Tipton and Mr. Titus for purposes of drafting his search warrant affidavit.

Though it was in the evidence locker by then and he could have accessed it if he had known it was there to access, Det. Arnold did not review the video from the DWU library before he submitted his search warrant affidavit to the state court magistrate judge.  Det. Arnold was of the opinion that based on the photo he had reviewed on Det. Fechner's phone, Mr. Tipton could be neither identified as nor ruled out as the DWU flasher.  Det. Arnold later believed he had persuaded Det. Fechner as such, but Det. Fechner unequivocally testified that after reviewing the library surveillance video, he persisted in his belief that Mr. Tipton was not the DWU flasher.   Neither detective recalled specifically discussing the subject, however, until after Det. Arnold had submitted his search warrant affidavit to the state magistrate judge.

The search warrant affidavit requested permission to search both vehicles registered to Mr. Titus and room 15 at the Siesta Motel for evidence pertaining to (1) the DWU flasher and (2) narcotics.  See EX 1.  The affidavit also sought permission to obtain urine samples from both Mr. Tipton and Mr. Titus, to test for evidence of illegal drugs.  Id.  Det. Arnold estimated the state magistrate judge reviewed the affidavit and signed the warrant between 4:00 and 5:00 p.m.  The warrant was executed on the motel room at 5:25 p.m., but the vehicles were not searched until the next day.

The execution of the search warrant resulted in the discovery of a black backpack in the bathroom of room 15 at the Siesta Motel.  The backpack contained a firearm which is the subject of this prosecution.  The search of the Mercury Mountaineer resulted in the discovery of drug paraphernalia.   Both Mr. Titus and Mr. Tipton's urinalysis tests were positive for methamphetamine.

### DISCUSSION

**A.     Whether the State Court Search Warrant was Invalid?**

Mr. Titus and Mr. Tipton assert that the search warrant was invalid because Det. Arnold included false information and omitted several crucial facts from his search warrant affidavit.  Had the false facts been excluded and the necessary crucial facts been included, Mr. Titus and Mr. Tipton argue, the affidavit would not have demonstrated probable cause to support the issuance of a warrant.

### 1.     Preliminary Showing for a <u>Franks</u> Hearing

A defendant may challenge an affidavit supporting a search warrant on grounds that the affiant deliberately or recklessly included false information.  <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978).  A defendant may also challenge the deliberate or reckless omission of material information from a search warrant affidavit.  <u>United States v. Buchanan</u>, 574 F.3d 554, 563 (8th Cir. 2009).  As a preliminary matter, a defendant is only entitled to a <u>Franks</u> hearing if he makes a substantial showing that an affiant to a search warrant application knowingly or intentionally, or with reckless disregard for the truth, made false statements or omitted material facts and that the alleged

13

statements were necessary to a finding of probable cause.  <u>Franks</u>, 438 U.S. at

155-56.  "Whether [the defendant] will prevail at that hearing is, of course,

another issue."  <u>Id.</u> at 172.

The court previously found (and so notified the parties pre-hearing) that

defendants were entitled to a <u>Franks</u> hearing.  Mr. Titus and Mr. Tipton made a

specific, detailed showing of the facts they claimed were either made with a

reckless disregard for the truth or which were omitted from Det. Arnold's

search warrant affidavit.  The statements contained within the affidavit, made

by Det. Arnold, which Mr. Titus and Mr. Tipton claim were made with a

reckless disregard for the truth are:

- I was informed by INV JACKSON that the suspect was described to us as a white male, approximately 6' tall with short, brown hair, wearing plaid pants and a black shirt and possibly having and wearing a black bandana.
- Inv. Larson, Inv. Fechner and I then left the University to search the immediate area for anyone matching the description of the suspect.  At approximately 1230 hours I stopped at the Siesta Motel located at 1210 W. Havens and made contact with the manager.  The manager advised me that he had two males recently rent room number fifteen (15).  The manager stated that the males had acted strangely while renting the room.
- Inv. Larson looked through the front window of room 15 and stated there were two males inside that appeared to be hiding things.
- The male also matched the description of the male that had showed his genitalia to the female victim at Dakota Wesleyan University as he was a white male six feet tall with a black shirt and short brown hair.
- I remembered from initial description of the male suspect involved in the exposure incident at Dakota Wesleyan University that it has been reported that he had a black bandana.
- Titus agreed that Tipton matched the description of the male suspect in the above case.
- Due to my suspicion that Tipton may be under the influence of narcotics, the fact that Titus and Tipton took so long to open the door, and Inv. Larson had seen Tipton hiding items, Titus being in

14

the bathroom and a backpack being hidden behind the toilet I called dispatch and asked if they could have Trooper Lord who is a K-9 handler come to my location to perform an open air sniff on the Titus vehicle for narcotics.

- I then received a photo of the suspect involved in the illegal exposure of his genital at Dakota Wesleyan University. The photo was grainy and taken from a distance, but the suspect in the photo did resemble Tipton. The male suspect in the photo from Dakota Wesleyan was a white male with short brown hair wearing a black shirt with print on the front of it and bluish purple pants. When I made contact with Tipton he was wearing a black tee shirt with print on the front blue jeans and tennis shoes. Tipton is six feet tall and has short brown hair. Tipton did match the photo that was taken of the suspect at Dakota Wesleyan University but the photo was too grainy to make a positive identification.
- Therefore I ask for a search warrant authorize a search . . . for any . . . clothing consistent with what the suspect was wearing that had exposed his genitals to the female student at Dakota Wesleyan University to include black shirts, black bandanas, blue or purple pants.
- I asked Titus what he was on Federal probation for and he stated that he was on federal probation for distribution of narcotics.
- I had dispatch perform a criminal background check on both Titus and Tipton. Both Titus and Tipton have multiple drug related arrests consisting of drug paraphernalia and distribution of methamphetamine on their criminal background checks.

Mr. Titus and Mr. Tipton also assert Det. Arnold omitted critical facts from the affidavit. Specifically, they assert Det. Arnold should have included in the affidavit:

- The short period of time Mr. Tipton had been in room 15 at the Siesta motel;
- The slightly longer, but still short amount of time Mr. Titus had been in room 15 at the Siesta motel;
- The details the two men had provided about their whereabouts that day; and
- The corroborative condition of the two vehicles parked in front of room 15, and of room 15 itself.

Based on this showing, the court allowed evidence at the hearing concerning these claimed falsehoods and omissions.

15

## 2.    Merits of the <u>Franks</u> Issue

### a.    Only One of The Misstatements or Omissions Was Intentional or Reckless

To prevail on a <u>Franks</u> challenge, the court first determines whether the affiant officer intentionally or recklessly made false or misleading misstatements or omissions in support of the warrant.  <u>United States v. Martinez-Garcia</u>, 397 F.3d 1205, 1215 (9th Cir. 2005) (quoting <u>Franks</u>, 438 U.S. at 155-56).  If it finds by a preponderance that the information was deliberately or recklessly stated or omitted, the court must then inquire whether the excision of the false information or addition of the omitted material renders the affidavit "insufficient to establish probable cause."  <u>Franks</u>, 438 U.S. at 156.  Because a search warrant affidavit is presumed valid, <u>see</u> <u>Franks</u>, 438 U.S. at 171, the burden of proof rests on the defendant, and the government has no burden to rebut the defendant's allegations or to otherwise move forward with the evidence.

In making this determination, the Eighth Circuit has instructed that "[o]ur touchstone is 'probability' not 'certainty' and one-hundred percent reliability . . . [is] not crucial to the issuance of the warrant."  <u>United States v. Reivich</u>, 793 F.2d 957, 963 (8th Cir. 1986).  At issue in <u>Reivich</u> was whether the affiant officer committed a <u>Franks</u> violation when he failed to include in his warrant affidavit the fact that his drug informants had been offered leniency regarding their own pending charges.  <u>Id.</u> at 958.  The district court found a <u>Franks</u> violation but the Eighth Circuit reversed, noting that even if the affidavit was corrected to include the information, it would have supported a

16

finding of probable cause.  Id. at 962-63.  "After all, we expect . . . judicial officers to be only neutral and detached—not naïve and ingenuous."  Id. at 963.

To prove reckless disregard for the truth, the defendant must prove that the affiant "in fact entertained serious doubts as to the truth of the affidavits or had obvious reasons to doubt the accuracy of the information therein."  United States v. Clapp, 46 F.3d 795, 801 (8th Cir. 1995) (citation omitted); United States v. Williams, 737 F.2d 594, 602 (7th Cir. 1984).  In Franks, the court explained that

> When the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a *truthful showing.*  This does not mean "truthful" in the sense that every fact recited in the warrant is necessarily correct, for probable cause may be founded on hearsay and upon information that is received from informants, as well as on information within the affiant's own knowledge that must be garnered hastily.  But surely it is to the "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

Franks, 438 U.S. at 164-65 (citations omitted, punctuation altered).

However, "failure to investigate fully is not evidence of an affiant's reckless disregard for the truth."  United States v. Miller, 753 F.2d 1475, 1478 (9th Cir. 1985); United States v. Mastroianni, 749 F.2d 900, 909-10 (1st Cir. 1984); United States v. Young Buffalo, 591 F.2d 506, 510 (9th Cir.) (1979).  Probable cause "does not require an officer to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence."  United States v. Dale, 991 F.2d 819, 844 (D.C. Cir.  1993).  The mere fact of an omission, standing alone, is insufficient to demonstrate intent or reckless disregard.  United States v. Shorter, 328 F.3d 167, 171 (4th Cir.

2003) (affirming the district court's denial of relief after a <u>Franks</u> hearing where defendant failed to present any evidence, beyond the mere fact of omission, that the investigator's conduct was deliberate or reckless) (quoting <u>United States v. Colkley</u>, 899 F.2d 297, 301 (4th Cir. 1990)).

The court concludes that with only one exception, Mr. Titus and Mr. Tipton have failed to demonstrate Det. Arnold acted intentionally or recklessly as to the alleged falsehoods or omissions from his search warrant affidavit.  In reaching this conclusion, the court has carefully considered each of the falsehoods and omissions alleged by Mr. Titus and Mr. Tipton.

      **1.**    **Det. Arnold's Omission of the Distinction Between the DWU Flasher and the DWU Suspicious Person for Purposes of the Description of the DWU Suspect Was Not Intentionally Misleading or in Reckless Disregard For the Truth.**

Though they have painstakingly separated them, at the heart of the majority of Mr. Titus and Mr. Tipton's <u>Franks</u> claims is their contention that Det. Arnold indiscriminately intermingled within his affidavit elements of the description of the DWU flasher and suspicious person, without specifically explaining to the magistrate judge that it was never determined whether the flasher and suspicious person was one in the same.  During the course of the evidentiary hearing, however, it became clear to this magistrate judge that the omission of this detail was not intentional or in reckless disregard for the truth.

DWU is a very small, private college campus with only 378 male students.  It's the kind of place where people notice someone who, in the words of the DWU president, "doesn't belong."  On the same morning of the flasher

18

incident, another man unfamiliar to campus with at least basic similarities to
the flasher (white male, short brown hair) had been seen on campus covering
his face with a black bandana.  In a large city, perhaps nobody would think it
odd to see a white male non-student with short brown hair passing through the
library on a college campus.  Likewise nobody would probably think it odd to
see, on that same college campus, a white male non-student with short brown
hair running around with a black bandana covering his face.  But in Mitchell,
South Dakota, on the campus of a small, religious college, these two events
were considered odd enough that when they happened on the same morning,
people on campus obviously immediately connected them.  Thus, *in the course
of the flasher investigation*, the description of the suspicious person who had
been seen on campus earlier in the morning was reported to Officer
Loudenburg, who disseminated it to the rest of the Mitchell Police
Department.[10]  The description of the flasher and the suspicious person was

---

[10] The court notes that much of Mr. Tipton and Mr. Titus's argument regarding
the exact description of the DWU flasher suspect depends upon the description
as it was relayed to Det. Arnold by other officers or investigators within the
Mitchell Police Department (i.e. whether the shirt was "dark" or "black" and
whether the pants were "dark" or "flannel" or "plaid" and whether the suspect's
description included that he was six feet tall.  It also depends largely upon
whether the description includes the black bandana, which was connected to
the "suspicious person" on the DWU campus –a person who may or may not
have been the same person as the flasher.

 The Franks opinion itself framed its holding as "where the defendant makes a
substantial preliminary showing that a false statement knowingly and
intentionally, or with reckless disregard for the truth, was included *by the
affiant in the warrant affidavit*, and if the allegedly false statement is necessary
to the finding of probable cause, the Fourth Amendment requires that a
hearing be held at the defendant's request."  Franks, 438 U.S. at 155-56
(emphasis added).  A Franks challenge requires the court to evaluate the
affiant's conduct and affidavit, not that of any other law enforcement officer

immediately and naturally combined for all practical purposes—even though nobody knew for sure if the flasher and the suspicious person was one person or two. In his search warrant affidavit, Det. Arnold merely continued forward with the combined description.

This same combined description –even though they were not sure the flasher and the suspicious person were one in the same--was the one that was recounted by each member of the Mitchell Police Department who testified at the evidentiary hearing when looking for the DWU flasher.  Officer Loudenburg explained it best when he explained he met with the DWU president.  She told Officer Loudenburg about the suspicious person who had been seen on campus before the flasher incident.  Officer Loudenburg obtained the description of the suspicious person from the DWU president and obtained the description of the flasher from the flasher victim.  Because nobody knew if the suspicious person and the flasher were the same person, Officer Loudenburg unequivocally testified that he gave <u>both</u> descriptions to the other Mitchell Police Department officers who were on campus looking for the flasher and <u>both</u> were broadcast out over the police radio.  <u>See</u> transcript at pp. 150-51.  Eventually, the flasher description evolved into a white male, six feet tall, with flannel pants, a dark t-shirt, short brown hair, who might have a black bandana.  "Evaluating an affiant's state of mind requires [the court] to view all of the evidence."  <u>United States v. Finley</u>, 612 F.3d 998, 1003, n. 7 (8th Cir. 2010).  Given all of the evidence in this case, this court cannot find that Det.

involved in the investigation.  <u>See also</u> <u>United States v. Conant</u>, 799 F.3d 1195, 1201 (8th Cir. 2015).

Arnold's inclusion of the suspicious person's characteristics in the description of the DWU flasher within the search warrant affidavit was done with the intent to mislead or with a reckless disregard for the truth.

Det. Arnold's failure to explain to the magistrate judge that there had been two incidents on campus and that nobody could be sure if both incidents involved the same person was probably negligent. But given the fact that the entire police department was on the lookout for a person bearing the characteristics of both the flasher and the suspicious person, it is clear to this magistrate judge that Det. Arnold did not know with certainty that the flasher and the suspicious person were <u>not</u> the same person. It is also clear to this magistrate judge that Det. Arnold did not "in fact entertain serious doubts as to the truth of the affidavit or ha[ve] obvious reasons to doubt the accuracy of the information therein." <u>Clapp</u>, 46 F.3d at 801.

Finally, this court cannot quite understand the profound emphasis on whether the clothing Mr. Tipton was *wearing* when the Mitchell Police Department Detectives arrived at the Siesta motel matched the description of the clothing worn by the DWU flasher, as it pertains to the statements in Det. Arnold's search warrant affidavit. The flashing incident occurred at approximately 10:40 a.m. The Mitchell Police Department detectives did not arrive at the Siesta motel seconds or even minutes later. They arrived at the Siesta nearly *two hours* later—at 12:28 p.m. This lag provided plenty of time for any sensible flasher to have changed outfits. So it does not really matter whether, by the time officers arrived at the Siesta Motel, the clothing Mr. Tipton

21

was *wearing* matched the description of the clothing worn by the DWU flasher. Though the affidavit describes the similarity between the clothing worn by Mr. Tipton and the flasher, it also acknowledges Mr. Tipton was wearing jeans, not flannel pants.

The affidavit requests permission to search the *motel room* and the *vehicles* in addition to Mr. Tipton's person for clothing matching the description of the clothing worn by the flasher.  Common sense dictates that if Det. Arnold was sure Mr. Tipton was *wearing* the clothes or the bandana, Det. Arnold would not need to also search his motel room or the vehicles for those items. The magistrate judge reading the affidavit probably reached the same conclusion.  "After all, we expect . . . judicial officers to be only neutral and detached—not naïve and ingenuous."  Reivich, 793 F.2d at 963.

### 2. Det. Arnold's Failure to Acknowledge the Siesta Motel Manager's Indication He Did Not Think Either Titus Or Tipton Matched The DWU Flasher's Description Was Not Intentionally Misleading Or In Reckless Disregard For The Truth.

During the evidentiary hearing, Mr. Titus and Mr. Tipton established that the Siesta Motel manager told Det. Arnold during the detectives' initial stop at the Siesta that he (the manager) had not seen anyone matching the DWU flasher's description.  On direct examination, Det. Arnold explained that on their first stop at the Siesta, the manager told them he'd not seen anyone matching the flasher's description, but two men who were acting strange had checked in earlier.  One of them was James Tipton—the same name as the subject of an active fraud case which Det. Arnold was investigating.

22

On Det. Arnold's cross-examination counsel elicited what description of the flasher had been given to the manager, for purposes of determining the manager's statement that neither Titus nor Tipton matched.  The following exchange occurred:

Counsel:   And there really wasn't any other description of that individual other than that, was there?
Arnold:    I would have to look at it.  Off the top of my head I couldn't tell you. I think when I got the description it was—what we were looking for was a white male, approximately 6 feet tall, and in his mid to–mid twenties.  Twenty, thirty.
Counsel:   A fairly generic description?
Arnold:    Short brown hair, Caucasian, black shirt with black bandana.
Counsel:   Okay, and flannel to plaid pants?
Arnold:    Flannel, plaid pants.  Blue or purple in color.
Counsel:   So you go to see [the manager].  You give him a description.  Plaid pants, black shirt, correct?     And he says, "I didn't see anybody with that stuff on."[11]
Arnold:    Well, I told him Caucasian male, short brown—I described the male, described the situation, what we were looking for with the indecent exposure.  And he said he hadn't seen anybody that matched that description.  But for some reason Rodney Titus and James Tipton, he decided to bring that up.

Mr. Titus and Mr. Tipton assert Det. Arnold's failure to acknowledge in the affidavit that the Siesta Motel manager indicated he'd not seen anyone matching the DWU flasher's description when the detectives first stopped by the Siesta office was intentionally misleading or done with a reckless disregard for the truth, because it serves to "falsely strengthen the match" between Mr. Tipton and the DWU suspect.  This court disagrees.

First, Det. Arnold acknowledged in his affidavit that Mr. Tipton was wearing jeans, which was never part of the DWU suspect's description.  If, as

_____

[11] Again, portions Detective Arnold's report were produced to the court before the hearing.  See Docket 78-3, p. 2.  In that report, Det. Arnold explained the Siesta manager "had not seen anyone wearing the clothing I described."  Id.

counsel's cross-examination suggests, when searching for the DWU flasher the police were (two hours later) still emphasizing the suspect's attire rather than his physical attributes, then it is not surprising the Siesta manager responded in the negative when asked if he'd seen anyone matching the description.

Second, Det. Arnold made very clear in his affidavit that the reason his interest was piqued by the Siesta manager's comments about the two men who rented room 15 had little to do with the DWU flasher.  It was that the manager said they were acting "strange" or "suspicious" and primarily because the manager told Det. Arnold one of them was named James Tipton—the very same name associated with Det. Arnold's active fraud case.  The affidavit states Det. Arnold told the manager he "need[ed] to speak to TIPTON reference my fraud case."  That clearly was the primary reason the detectives returned to the Siesta Motel to further investigate—not to see whether Mr. Tipton was the DWU flasher.  This court finds, therefore, that Det. Arnold's omission of the fact that the Siesta manager stated he'd not recently seen anyone matching the DWU flasher's description was not intentionally misleading or done in reckless disregard for the truth.

> **3.    Det. Arnold's Recitation Of Det. Larson's Statement Regarding Mr. Titus and Mr. Tipton "Hiding Things" Was Not Intentionally Misleading Or Made In Reckless Disregard for the Truth.**

Mr. Titus and Mr. Tipton criticize this part of the affidavit because they assert it is inconsistent with what Det. Larson and Det. Fechner later wrote in their reports (i.e. that Det. Larson said Mr. Tipton "carried" something to the bathroom).  But at the evidentiary hearing, Det. Larson confirmed that he told

24

Det. Arnold "they're hiding things," as he (Larson) peeked through the window of the motel room while Det. Arnold knocked on the door. Det. Arnold did not have Det. Larson or Det. Fechner's reports to review before he (Arnold) wrote the affidavit. The affidavit instead was based on Det. Larson's oral statements at the scene earlier the same day.

Mr. Tipton and Mr. Titus also criticize the affidavit for implying that <u>both</u> men were involved in the "hiding" of the backpack, when in reality, only Mr. Titus put the backpack in the bathroom as Det. Arnold was knocking on the door. This criticism is unfounded. Det. Larson could see two men in the room. He could see that one (later determined to be Mr. Tipton) was in the front of the room, near the door, while the other (later determined to be Mr. Titus) was near the back. The man in the front did not immediately answer the door when Det. Arnold knocked, but instead waited for about 60 seconds while the man in the back grabbed something and went into the bathroom. Common sense indicates the two were working in concert. If these two men had been found at opposite ends of a thirty-room mansion, their cooperation might not have been obvious by a sixty-second delay in opening the door. Detective Larson, however, watched through the window for sixty seconds as one man stood a few feet from the door in a small motel room without answering it while the other man grabbed something and headed to the bathroom. Sixty seconds might not seem like a delay in the first scenario, but in this situation, it did. If there were any doubt about whether Mr. Titus and Mr. Tipton were acting in concert, it was erased when, upon realization of police presence, Mr. Titus did

25

not emerge from the bathroom, and Mr. Tipton denied Mr. Titus was even there.  To tell a judge Mr. Titus and Mr. Tipton men were acting in concert was certainly not intentionally misleading or a statement made in reckless disregard of the truth.

> **4.    Det. Arnold's Statement That Mr. Titus Laughingly Agreed Mr. Tipton Matched The Flasher's Description Was Not Intentionally Misleading Or Made In Reckless Disregard For The Truth.**

In his affidavit, about conversation with Mr. Titus and Mr. Tipton at the Siesta Det. Arnold wrote "[w]hen we arrived outside I advised Titus and Tipton of the two cases I was investigating and that Tipton matched the description of the male that had been seen at University.  Titus agreed that Tipton did match the description or (sic) the male suspect in the above case and laughed."

Mr. Titus and Mr. Tipton assert this sentence was intentionally misleading or made with reckless disregard for the truth because (1) Mr. Titus had never seen the DWU suspect; and (2) Det. Arnold included this useless opinion but did not include the opinion of Det. Fechner, who had viewed the surveillance video, and who did not believe Tipton was the DWU flasher.

This court agrees that whether Mr. Titus thought Mr. Tipton matched the description of the DWU flasher was completely useless information.  But nothing in Det. Arnold's affidavit suggested that Mr. Titus <u>had seen</u> the DWU flasher, so the state magistrate judge surely took this sentence for what it was worth--nothing.  "After all, we expect . . . judicial officers to be only neutral and detached—not naïve and ingenuous."  <u>Reivich</u>, 793 F.2d at 963.  That Det. Arnold included in his affidavit that Mr. Titus "laughed" as he agreed

Mr. Tipton matched the description neutralized what little influence, if any, this sentence may have had upon the judge.

The court has already explained that Det. Arnold and Det. Fechner did not discuss Det. Fechner's thoughts on whether Det. Fechner thought, based on his review of the surveillance video, Mr. Tipton was a match for the DWU flasher until after the affidavit had been written. They had no in-depth discussion about this subject until later because by the time Det. Fechner returned to the Siesta with the photo on his cell phone, the State Trooper's drug dog had positively indicated, Det. Arnold had decided to transport Mr. Titus and Mr. Tipton, and focus of the investigation at the Siesta had shifted to a drug investigation. Both Det. Arnold and Det. Fechner indicated they did not recall having a discussion about Det. Fechner's disagreement with Det. Arnold about Mr. Tipton's (non)resemblance to the DWU flasher until after Det. Arnold had drafted his affidavit. The timing of Det. Arnold and Det. Fechner's discussion about their disagreement regarding Mr. Tipton's (non)resemblance to the DWU flasher explains Det. Arnold's failure to mention Det. Fechner's disagreement in the affidavit. That Det. Arnold mentioned Mr. Titus's laughing agreement that Mr. Titus matched the description is curious, but not intentionally misleading or made with a reckless disregard for the truth.

27

**5.      Det. Arnold's Statements Regarding A Delay In Answering The Motel Door, And The Two Men "Hiding Things" As A Reason For Requesting The Canine Sniff, Were Not Intentionally Misleading Or Made With A Reckless Disregard For The Truth.**

Mr. Titus and Mr. Tipton take issue with the statement in Detective Arnold's affidavit which says Mr. Tipton "took so long" to come to the door and indicating that both Mr. Tipton and Mr. Titus were seen "hiding" things (rather than Mr. Titus only "carrying" something into the bathroom). For the reasons already explained above in section "3," this court does not find Det. Arnold's description of both men "hiding" things to be intentionally misleading or made in reckless disregard for the truth. Additionally, and as also explained above in section "3," while 60 seconds may not seem like a delay in other circumstances, Detectives Arnold, Larson and Fechner explained why they considered it so in this circumstance.

For the reasons already explained in section "3" above, therefore, this court does not find Det. Arnold's statements in the affidavit regarding both Mr. Titus and Mr. Tipton to be "hiding things" or about the delay in answering the door at the Siesta Motel to have been intentionally misleading or made with reckless disregard for the truth.

**6.      Detective Arnold's Failure To Mention Detective Fechner's Disagreement, After Det. Fechner Reviewed The Video Surveillance, About Whether Mr. Tipton Was The DWU Suspect Was Not Intentionally Misleading Or Made With A Reckless Disregard For The Truth.**

Det. Arnold did not review the video of the DWU flasher before he drafted his search warrant affidavit. Instead, he only viewed the grainy photo on

28

Det. Fechner's cell phone.  He also did not have an in-depth discussion with Det. Fechner about Fechner's thoughts on the video.  By the time Det. Fechner returned to the Siesta, the drug dog had positively indicated, and what started out as a fraud/flasher investigation had quite unexpectedly turned into a narcotics investigation.  Det. Arnold's failure to probe Det. Fechner's thoughts about Whether Det. Fechner thought it was likely Mr. Tipton was the DWU Flasher, and/or Det. Arnold's failure to take time to track down the video once he returned to the police station to write his affidavit so he could review the video himself, in and of themselves were not intentional or reckless.  Miller, 753 F.2d at 1478; Mastroianni, 749 F.2d at 909-10; Young Buffalo, 591 F.2d at 510.  But probable cause "does not require an officer to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence." Dale, 991 F.2d at 844.  Det. Arnold had been on scene at DWU and had been listening to the dispatch reports, along with the other officers who were investigating the incident.  Perhaps, in retrospect, and given the fact that Mr. Titus and Mr. Tipton were already in custody, Detective Arnold could have contacted the DWU flasher victim to have her view a photo lineup containing Mr. Tipton's photo before submitting his warrant affidavit asking to search for evidence of the DWU incident in the Siesta motel.  He also could have taken the time to review the video himself.  This would have been a bit more of investigative work that would have either identified Mr. Tipton as the DWU flasher or definitively ruled him out.  However, failure to do so was not deliberate or reckless.

29

### 7. Detective Arnold's Misstatement About Mr. Titus's and Mr. Tipton's Criminal History Was Made With Reckless Disregard For The Truth.

In his search warrant affidavit, Det. Arnold stated Mr. Titus "stated that he was on Federal probation for distribution of narcotics." See EX. 1, p. 5. Det. Arnold also stated "I had dispatch perform a criminal background check on both Titus and Tipton. Both Titus and Tipton have multiple drug arrests consisting of drug paraphernalia and distribution of methamphetamine on their criminal background checks." Id. p. 6.

In reality, the "Triple I" background check revealed Mr. Titus was on federal probation for being a prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g) and had several state misdemeanor theft or assault arrests, but only one drug arrest that was for keeping a place for the sale or use of drugs—not for drug paraphernalia or distribution of methamphetamine.  See EX 3. Mr. Tipton's "Triple I" background check revealed he had two drug paraphernalia arrests, two arrests for drug possession, and one for distribution of methamphetamine.  See EX 4.

Mr. Titus asserts Det. Arnold purposely misled the state magistrate judge by relaying the statement Titus allegedly made at the Siesta regarding the reason he (Titus) was on federal supervision.  Mr. Titus surmises there would be no reason to "lie to make his criminal history seem worse than it is."  This court views the situation differently.  It is not inconceivable, given that Mr. Titus had just tried to hide a firearm in the bathroom and having been "called" on trying to conceal his presence in the room by Det. Fechner,

30

Mr. Titus would not readily admit he was on federal supervision for being a prohibited person in possession of a firearm.  It is entirely conceivable to this court that in the panic of the moment Mr. Titus made up a different reason for being on federal supervision.  The court therefore does not find Det. Arnold's statement in the affidavit about Mr. Titus' professed reason for his federal supervision to have been made with the intent to mislead or in reckless disregard for the truth.

The result is different, however, for Det. Arnold's statement that "[b]oth Titus and Tipton have multiple drug arrests consisting of drug paraphernalia and distribution of methamphetamine on their criminal background checks." By the time Det. Arnold wrote his affidavit, he had the Triple I reports for both men in front of him.  Both men clearly do not have multiple drug arrests: Mr. Titus had only one, and the one Titus had was for neither distribution nor drug paraphernalia, but rather it was for possession and keeping a place for the use or sale of drugs.  Det. Arnold's statement is inaccurate as it pertains to Mr. Titus.  Mr. Tipton did have multiple arrests, one for distribution and two for paraphernalia, so Det. Arnold's statement was accurate as to Mr. Tipton. Because Det. Arnold had the Triple I at his disposal before he wrote the affidavit, and the sentence regarding "both" men's criminal history is inaccurate as to Mr. Titus, this court finds the statement was made with reckless disregard for the truth.

31

8.  **Det. Arnold's Omission Of The Facts About The Length Of Time Mr. Titus And Mr. Tipton Had Been At The Siesta, Their Explanation Of Their Whereabouts, And The Items In The Vehicles, Was Not Intentionally Misleading Or Done With Reckless Disregard For The Truth.**

Mr. Titus and Mr. Tipton assert Det. Arnold intentionally or recklessly omitted the facts that (1) Mr. Tipton and Mr. Titus had provided explanations for their whereabouts earlier in the day; (2) the vehicles were full of household items, consistent with their explanations that they had been moving Mr. Tipton from one motel into another; and (3) they had been at the Siesta for a very short amount of time. Mr. Titus and Mr. Tipton assert these omissions were material, considering the scope of the warrant requested by Det. Arnold included the motel room and Mr. Titus's vehicle and person, rather than just Tipton's person and vehicle, when it was only Tipton, not Titus who was acting as if he was under the influence of drugs.

Again, the court disagrees with this analysis. The analysis assumes the facts were material because had they been presented to the judge, there would not have been probable cause to search the motel room, Titus's person or Titus's vehicle. But that analysis is flawed because the suspicious behavior observed by the officers when they arrived at the Siesta was exhibited by both Mr. Titus and Mr. Tipton. The room was rented in Mr. Tipton's name and only Mr. Tipton was exhibiting signs of being under the influence of drugs. But as explained above, it was Mr. Titus and Mr. Tipton acting in concert who were observed "trying to hide things" in the motel bathroom. Regardless of the explanation he provided for his presence at the motel room, how long he had

been there, or how much had been moved in, that Mr. Titus ducked into the bathroom and appeared to be attempting to conceal something there changed Mr. Titus's role from mere innocent bystander to fair game for purposes of the target of the search warrant.   See United States v. Schmitz, 181 F.3d 981, 987 (8th Cir. 1999) (officer's omission of fact that victim lacked apparent injuries, was in good spirits, and that she was wearing clean clothes when police arrived not material to probable cause for warrant to search for evidence of earlier hit and run incident by her boyfriend).   In other words, that Mr. Titus and Mr. Tipton provided explanations for their whereabouts earlier in the day, the short amount of time they had been at the Siesta, and the items visible in the vehicles are not necessarily inconsistent with either (1) Mr. Tipton being the DWU flasher or (2) illegal drug activity on the parts of either or both men. Therefore, those details were not material to whether probable cause existed to search the motel room and/or Mr. Titus's person and vehicle.  This court finds these details were not, therefore, omitted with intent to mislead or with a reckless disregard for the truth.

### b. Correcting the Falsehoods/Adding the Omissions Does Not Defeat Probable Cause

If one assumed Mr. Titus and Mr. Tipton showed an intent to mislead or reckless disregard for the truth in the statements or omissions by Officer Arnold, the court would then proceed to the next step by excising the false and misleading statements and adding in the omitted information and evaluating whether the affidavit still demonstrates probable cause.  "When the affidavit supporting the search warrant sets forth facts sufficient to create a fair

probability that evidence of a crime will be found in the place to be searched, probable cause exists." United States v. McIntyre, 646 F.3d 1107, 1115 (8th Cir. 2011) (quoting Unites States v. McArthur, 573 F.3d 608, 613 (8th Cir. 2009) (quoting United States v. Terry, 305 F.3d 818, 822 (8th Cir. 2002))). See also Illinois v. Gates, 462 U.S. 213, 238 (1983). "Probable cause requires only a showing of fair probability, not hard certainties." United States v. Hudspeth, 525 F.3d 667, 676 (8th Cir. 2008). Whether a search warrant is supported by probable cause is to be determined by considering the totality of the circumstances. United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007). The issuing judge's determination of the issue of probable cause should be paid "great deference." United States v. O'Dell, 766 F.3d 870, 873 (8th Cir. 2014).

Reviewing courts examine the sufficiency of an affidavit in support of a search warrant using "common sense" and not using a "hypertechnical" approach. Grant, 490 F.3d at 632 (citing United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (quoting United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993))). "Where the [issuing judge] relied solely upon the supporting affidavit to issue the search warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause"—except here, of course, the court "adds in" the correct statements and proposed omissions. O'Dell, 766 F.3d at 874. See also Hudspeth, 525 F.3d at 674; United States v. Olvey, 437 F.3d 804, 807 (8th Cir. 2006); United States v. Cowling, 648 F.3d 690, 695 (8th Cir. 2011).

A defendant seeking to suppress evidence obtained under a regularly issued search warrant has the burden to show by a preponderance of the evidence that the search warrant was not supported by probable cause.  United States v. Chaar, 137 F.3d 359, 363 (6th Cir. 1998); United States v. De La Fuente, 548 F.2d 528, 534 (5th Cir) (1977).  Cf. Carter v. United States, 729 F.2d 935, 940 (8th Cir. 1984) (generally, burden is on the defendant who moves to suppress evidence except where the search was without benefit of a search warrant).

Here, the only statement this court has found was made with reckless disregard for the truth is the recitation of the two men's criminal history.  But even if Det. Arnold had recited their criminal history with razor-sharp precision, probable cause would still have existed to issue the warrant. Furthermore, if the proposed omissions were contained in Det. Arnold's search warrant affidavit, there would still be probable cause.  Specifically, had Det. Arnold spelled out with perfect clarity that nobody knew for sure whether the DWU flasher and the DWU suspicious person were one in the same, but that nevertheless the police were looking for a white male, six feet tall, with a black/dark shirt, flannel pants, and possibly in possession of a black bandana, this would not have changed the probable cause determination in this case. Neither would the addition of the fact that Det. Fechner disagreed with Det. Arnold about whether Mr. Tipton matched the description of the DWU Flasher.  Mr. Tipton and Mr. Titus's behavior once the police arrived at the motel room, along with the positive dog sniff, gave enough probable cause to

search even in the absence of any of the DWU evidence.  These facts give rise to a "fair probability" room 15 at the Siesta Motel would contain evidence of a crime.  Hudspeth, 525 F.3d at 676.  Detective Arnold was not required to place before the judge "all" the facts known to him; just sufficient facts to demonstrate a "fair probability."  Dale, 991 F.2d at 844.  A "fair probability" is all the law requires.  The court concludes that even if Det. Arnold's misleading statements and omissions could be viewed as reckless—which standard this court does not view as having been met (with the exception of the criminal record issue)--the correction of the statements to meet Mr. Titus and Mr. Tipton's satisfaction and the addition of those omissions to the search warrant affidavit does not defeat probable cause.  Accordingly, the court recommends denying Mr. Titus and Mr. Tipton's motion to suppress based on his Franks argument as to the search warrant.

## B.    Leon Good Faith

Even if an affidavit in support of a search warrant fails to provide probable cause for the issuance of the search warrant, the fruits of the search will not be suppressed if the officer who executed the search warrant relied upon that warrant in objective good faith.  United States v. Ross, 487 F.3d 1120, 1122-1123 (8th Cir. 2007) (describing good-faith exception pursuant to United States v. Leon, 468 U.S. 897, 921, (1984)).  "When assessing the good faith of the officers, [the court] look[s] to the totality of the circumstances, including any information known to the officers, but not included in the affidavit."  United States v. Rodriguez, 484 F.3d 1006, 1011 (8th Cir. 2007).

The question is whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization.  Hudspeth, 525 F.3d at 676.

The Leon good-faith exception does not apply in four circumstances: (1) where the affidavit in support of the search warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," (2) when "the issuing magistrate wholly abandoned his judicial role," (3) when the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid," and (4) when the issuing magistrate was misled by false information in an affidavit that the affiant knowingly or recklessly included.  Leon, 468 U.S. at 923 (citations omitted); United States v. Pruett, 501 F.3d 976, 980 (8th Cir. 2007), vacated and remanded on other grounds, 552 U.S. 1241 (2008);[12] Ross, 487 F.3d at 1122.

The Eighth Circuit found the first exception applicable in United States v. Herron, 215 F.3d 812, 814-15 (8th Cir. 2000).  In that case, law enforcement had drafted an affidavit focused on providing probable cause to search Buck's residence and farm for evidence of cultivation of marijuana.  Id. at 813-14. Then, without altering the affidavit, they submitted the same facts in support of a request for a search warrant for Herron's residence and farm.  Id.  The only facts alleged in the affidavit regarding Herron was that he had past convictions for cultivating marijuana, he was Buck's relative, and Buck had been observed

---

[12] The Supreme Court vacated the holding in Pruett as to what constitutes "use" of a firearm during a drug trafficking crime.

at Herron's residence four months earlier, on which occasion he stated he was there to help Herron harvest corn.  Id.  The government conceded on appeal that the search warrant for Herron's farm lacked probable cause, but urged the application of the Leon good faith exception.  Id. at 814.  The Eighth Circuit refused to apply Leon, noting that the deficiencies in the Herron affidavit were not technical legal deficiencies, but rather a complete absence of facts probative of finding marijuana at Herron's place.  Id. at 814-15.

Mr. Tipton and Mr. Titus do not invoke the second situation above.  The third situation described above refers to alleged infirmities "with the warrant itself rather than the affidavit behind the warrant."  United States v. Carpenter, 341 F.3d 666, 673 (8th Cir. 2003).  This exception would apply, for example, where the search warrant "failed to particularize the place to be searched or the things to be seized."  Id.  Under these circumstances, the officers executing the warrant "cannot reasonably presume it to be valid."  Id. (quoting Leon, 468 U.S. at 923).  Mr. Tipton and Mr. Titus do not invoke this third situation either.

The fourth situation is a Franks situation.  Mr. Tipton and Mr. Titus could assert this situation as to the warrant at issue in this case if probable cause no longer remained, rendering the warrant invalid, after the offending statements were removed and omissions were added.  Where Franks applies, Leon does not apply.  United States v. Conant, 799 F.3d 1195, 1202 (8th Cir. 2015).  The court agrees with this proposition—as far as it goes.  However, that proposition does not require suppression here.  The court has concluded no Franks violation occurred, with the exception of the criminal histories.  But

38

correction of the criminal histories statement has no effect on probable cause to issue the warrant.  Therefore, Franks does not automatically obviate the application of Leon here.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends denying Mr. Titus and Mr. Tipton's motions to suppress [Docket Nos. 74 and 76] in their entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 8th day of May, 2017.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate  Judge